C/M

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
   UNITED STATES OF AMERICA,

                   -against-                     **MEMORANDUM DECISION AND ORDER**

   LEONID GERSHMAN,                     16-cr-0553 (BMC)
                                                     24-cv-1410 (BMC)
                            Defendant.
------------------------------------------------------------ X

**COGAN**, District Judge.

      Following a three-week jury trial, defendant was convicted on all 26 counts with which he was charged, including racketeering, arson, pistol-whipping, and the extortion of eight victims.[1] He was sentenced to 198 months' custody, below his Guidelines range of 235-293 months.

      He has brought before the Court a *pro se* motion for habeas corpus relief from his conviction under 28 U.S.C. § 2255, alleging one ground for relief. He claims his two counsel were ineffective for not explaining one of the enhancements in the proposed plea agreement that the Government tendered prior to trial (which had an estimated Guidelines range of 108-135 months), and if they had explained that enhancement to him, he would have accepted the plea agreement. When I compare the detailed affidavits submitted by his former attorneys describing the plea negotiation process with defendant's conclusory, contrary version of what was a trivial point in the negotiations, I find that defendant's assertion that he would have taken the plea

---

[1] The conviction on Count 21, violation ofUf 18 U.S.C. § 924(c)(3)(A), was subsequently vacated, as the Government chose not to contest whether that conviction was for a "crime of violence" given the unsettled state of the law at that time.

agreement with better information from his attorneys is not plausible, and I therefore deny his motion.

## BACKGROUND

### I. The Evidence at Trial

Defendant was part of a multi-year criminal enterprise. It had no name used by its members but it was referred to at trial as the "Syndicate." The Syndicate had links to the Eastern European mafia. The Syndicate's activities included arson, extortion, marijuana distribution, firearms trafficking, and wire fraud. It had a hierarchy of sorts, and our defendant had control over and gave directions to lower-level Syndicate members. Proceeds of the illegal activities were shared between members of the Syndicate who participated in a particular activity and members who had not.

One of its main illegal activities was the hosting of weekly or twice-weekly high-stakes poker games, from which defendant made thousands of dollars in profits. These games took in collectively more than $2 million in annual profits for the Syndicate. They were not cash games. Losses were recorded on ledgers, which led to extortionate collection efforts by defendant and other Syndicate members when players were late on payments or failed to pay off their debts. The evidence at trial showed at least four extortion victims.

The Syndicate's activities also extended to an arson to shut down a rival gambling operation. Approximately 100 firefighters responded because the fire was so large, and at least one of those firefighters, Gabriel Buonincontri, who had entered the burning building to look for residents, was severely injured. He had to undergo multiple surgeries and sustained career-ending injuries. Other firefighters saved two trapped brothers, then 19 and 12 years old. The two teenagers inhaled enough toxic smoke to make the elder throw up; as the Second Circuit

noted, they were "nearly kill[ed]." United States v. Gershman, 31 F.4th 80, 88 (2d Cir. 2022), cert. denied, 143 S. Ct. 816 (2023).

In addition to the gambling, extortion, and arson, our defendant also made six-figure profits from loansharking for the Syndicate, lending out between $5,000-$10,000 at interest rates ranging from 72% to 144% per year.  That also led defendant to extort payments, including through the use of violence, when borrowers failed to timely make payments, as well as obstruction of justice.  At least three victims of that extortion were identified at trial.  After defendant's arrest, his sister met with one of the victims and told him to "keep his mouth shut" when he talked to defendant's lawyer, which the victim interpreted as a threat.  Defendant also asked his girlfriend to persuade this victim to write a false letter about defendant's role in the case.

The Syndicate ran a lucrative and violent marijuana distribution business that yielded profits for defendant of $60,000 per year.  Defendant also possessed firearms and supplied firearms to other Syndicate members.  Finally, the evidence at trial showed a number of other assaults that defendant committed, some with firearms (discharged on one occasion), one involving a high-speed car chase that ran red lights in a residential neighborhood, and one instance involving vandalism to the victim's apartment.

As noted above, defendant was convicted on all counts following a three-week jury trial and sentenced to a non-Guidelines sentence of 198 months, below the 235-293 month range as determined by the Court.  The Second Circuit affirmed, and the Supreme Court denied certiorari. Gershman, 31 F.4th at 108 (2d Cir. 2022).  I subsequently denied a motion for compassionate release and defendant brought this Section 2255 motion shortly thereafter.

## II.    The Present Section 2255 Motion and the Pretrial Plea Negotiations

During pretrial motion practice, the Government engaged in plea negotiations with defendant through his two attorneys, Jeffrey Lichtman and Jonathan Savella. The Government's offer was for defendant to plead guilty to racketeering with six underlying predicate acts, and to additionally stipulate to having committed assault in aid of racketeering as well as assault and discharge of a firearm in public.

In the proposed plea agreement's calculation of the Guidelines range, there were various enhancements to each of the counts, some applied separately for separate racketeering acts prior to the grouping analysis. In total, the proposal referred to three victims and 21 Guidelines provisions, spanning three pages. The enhancements included making extortion by threat (§ 2B3.2(b)(1)) (+2); demanding extortion in excess of $95,000 (§§ 2B3.2(b)(2) and 2B3.1(b)(7)(C)) (+2); preparation to carry out threat (§ 2B3.2(b)(3)(B)(ii)) (+3); bodily injury (§ 2B3.2(b)(4)(A)) (+2); brandishing a dangerous weapon (§ 2B3.2(b)(3)(A)(v)) (+3); and firearm used (§ 2A2.2(b)(2)) (+4). The grouping analysis required the addition of five levels based on six units for the various underlying acts (§ 3D1.4); and from there added one level for "Victims Underrepresented" (§§ 3D1.1 & 5K2.0). It then would have deducted one level for defendant's participation in a global resolution (§ 5K2.0). The result would have been a total adjusted offense level of 34 before acceptance of responsibility, and with defendant's criminal history category, his Guidelines range would have been 108-135 months' custody.

Defendant's present Section 2255 motion is based on one enhancement in this proposal – the one added offense level for Victims Underrepresented that cited Guidelines Sections 3D1.1 and 5K2.0. That was probably the least complicated factor in the proposed Guidelines calculation. Section 3D1.1 simply states that when calculating the Guidelines range, the Court

4

shall take into account any departures (Chapter Five).  Section 5K2.0(a)(3) (part of Chapter Five) simply states that if the Court finds that the Guidelines calculation overstates or understates the degree of harm to a victim or victims, it can depart.  See U.S.S.G. § 5K2.0(a)(3) (a departure "may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.").

Defendant's challenge to the effectiveness of his counsel is that they didn't explain this enhancement to him, and if they had, he would have taken the proffered plea agreement.  He states:

> The government offered movant a plea agreement with a range of 108 to 135 months imprisonment.  Movant rejected the plea offer because counsel failed to explain to him why page 6 of the plea agreement referred to an adjustment for "Victims Underrepresented", citing U.S.S.G. Section 3D1.1.  Section 3D1.1 contains no such adjustment.  Had counsel given the movant accurate responses to his concerns regarding page 6 of the plea agreement, he would have accepted the plea offer.

At the direction of the Court, his former attorneys Lichtman and Savella have submitted affidavits that tell a different story.

Attorney Lichtman describes how when he first got into the case, the Government told him that it had already made a plea offer of a seven-year mandatory minimum on the gun charge and a Guidelines range that in total would result in a sentence in the "mid-teens," which defendant had rejected.  In negotiating with the Government for a better offer, Lichtman told the Government, as defendant had instructed him, that defendant would only accept an offer having a total Guidelines calculation in the eight-year range.  He and Mr. Savella then attended a meeting with the Government in which the Government offered an agreement that had a Guidelines range of 108-135 months (nine to 11 ¼ years).

5

Lichtman and Savella visited defendant at the MDC to convey that offer and, to their surprise (since it was nearly in the range of the eight-year offer he wanted), he rejected it. Instead, he told them to come back with an offer in the five-year range. Defendant stated that if the Government was willing to come down to an offer with a Guidelines range of 108-135 months, he thought they would go much lower than that. His attorneys vigorously opposed his proposed strategy and told him the Government's case was very strong and they had gotten him close to the offer he had asked them to get. His attorneys felt defendant had reneged on what they asked him to do. Lichtman states that during this meeting, they did not discuss the calculation of the Guidelines range because defendant was rejecting the Government's plea offer outright.

Lichtman explains that after this meeting, he called defendant's parents and tried to persuade them to convince defendant to take the Government's plea offer, but they refused.

Lichtman and Savella returned to the MDC and met with defendant again. The calculation of the Guidelines in the Government's offer was again not discussed because defendant was adamant that he would not accept it. Lichtman and Savella advised him that his case was going to proceed to trial; defendant responded that he understood and was willing to do so.

Lichtman and Savella both aver that at no time during their meetings with defendant did defendant review the proposed plea agreement or ask them to explain the Victims Underrepresented enhancement that it contained in its Guidelines calculation because defendant was only interested in the total Guidelines range. Lichtman correctly notes the enhancement was only one point and would have added only 11-14 months to the estimated Guidelines range. In his view, that one-point enhancement played no role in defendant's decision to reject the

6

proposed plea agreement. Savella concurs that "at no point before the plea offer expired did Gershman ask me for additional explanation of the 'Victims Underrepresented' departure. Had he made such a request – or exhibited any interest in discussing the government's offer – I would have been eager to oblige."

Defendant has submitted a reply affidavit in which he states that he "repeatedly expressed concerns" about the Victims Underrepresented point in the proposed plea agreement to Savella, and that defendant was "apprehensive about the plea agreement because of Mr. Savella's inability to explain the reason or meaning of the Victims Underrepresented' adjustment …". He rejected the plea agreement, he states, because Savella gave him "non-responsive answers to [his] specific inquiries" about that enhancement and defendant's "fear was that [he] was going to get a lot more time than 108 to 135 months." He reaffirms that if he had been told that the reference to Section 3D1.1 was a "mistake, and [if counsel] simply asked the Government what was the basis" for the adjustment and then conveyed the answer to him, defendant would have accepted the plea agreement.

Defendant has also annexed an email exchange with Savella in February 2019, about six months after his conviction, long after the plea offer had expired. In that exchange, defendant related that he was going over his pre-sentence investigation report and stated:

> One last thing! Remember when we got the plea agreement?? There was an enhancement for a vulnerable victim, remember that???????? The one that you told me it was for the arson … Can you please find out if it was for the arson victim or not because you never told me exactly what it was for … I need to know that for myself … .

(Cleaned up). Savella's responsive email stated:

> We've discussed this dozens of times, my friend. The plea agreement didn't require you to plead guilty to the arson. It did, however, include an upward departure for "Victims Underrepresented." We don't know if the prosecutors had the arson victims in mind when they inserted that departure into the agreement.

7

> Whether they did or not, they would have been free to raise the arson at your sentencing.

## DISCUSSION

### I.     Legal Principles

Under the Antiterrorism and Effective Death Penalty Act of 1996, a federal prisoner "may move the court which imposed the sentence to vacate, set aside or correct the sentence," if (1) "the sentence was imposed in violation of the Constitution or laws of the United States," (2) "the court was without jurisdiction to impose such sentence," or (3) "the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a).

To prevail on a Section 2255 motion, a defendant must demonstrate "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000) (quoting United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995)). "[I]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the [district court] must dismiss the motion." Seabrook v. United States, No. 22-cv-841, 2023 WL 7489961, at *2 (2d Cir. Nov. 13, 2023) (quoting Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009)).

To demonstrate ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 687 (1984), a defendant must show two things: (1) that his counsel's performance was deficient, and (2) that the deficient performance prejudiced his defense. A court will deem performance deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Id. An ineffective assistance of counsel claim will fail if the defendant fails to make a sufficient showing under either of the Strickland prongs.

8

Id. at 697. This standard also generally applies to ineffective assistance claims involving conduct during guilty pleas and plea negotiations. See Lafler v. Cooper, 566 U.S. 156, 162-64 (2012).

To prove prejudice in the context of ineffective assistance claims during plea negotiations, a defendant must show that, but for counsel's errors, there is a reasonable probability that he would have accepted a plea offer, the plea offer would not have been withdrawn by the prosecution in light of intervening circumstances, the court would have accepted the terms of the plea offer, and "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Id. at 164; see also Fulton v. Graham, 802 F.3d 257, 266 (2d Cir. 2015).

## II. Analysis

On the record before me, defendant's argument is implausible on two levels.

Initially, I accept the Lichtman and Savella affidavits' statements that defendant was so dismissive of the Government's proposed 108-135 months Guidelines plea offer that he never asked about the Victims Underrepresented one-point enhancement until after his conviction. All of the circumstantial evidence supports their version and none of it supports defendant's.

First, it was only one point in a Guidelines calculation that had an adjusted offense level of 34, hardly a determinative factor as to whether to go to trial or not when defendant was facing a potential Guidelines sentence after conviction of nearly 40 years.

Second, the enhancement was easy to understand – he wouldn't have pled to the arson under the plea agreement, nor would he have pled to assault in aid of racketeering, another assault, and a discharge of firearm in public. Defendant would be assessed no points for any of

9

those victims, some of whom were severely injured or nearly died in the fire or were beaten or threatened with guns.

It could have been any of those underrepresented victims that caused the Government to add the one point. It could have been the victims for the counts as to which he did plead guilty if the Government felt any one of them were underrepresented considering the harm they suffered. Thus, the theories upon which the Government added the one point are so bountiful that, assuming *arguendo* that defendant's lawyers never asked the Government which victim gave rise to the enhancement, and therefore didn't know, it was probably smart not to ask. The Government might well have realized that there were so many underrepresented victims that a one-point enhancement wasn't enough. Indeed, had it been called to my attention, whether in the context of sentencing after a guilty plea or the sentencing that occurred after trial, I might well have concluded that one point wasn't enough.

In addition, defendant's assertion that § 3D1.1 "contains no such [Victims Underrepresented] adjustment" is too flimsy. As noted, § 3D.1.1 contains an express reference to Chapter V. The proposed plea agreement contained an express reference to § 5K2.0 right alongside its reference to § 3D1.1, thus showing where the Victims Underrepresented enhancement came from. Defendant could not have looked at the reference to § 3D.1.1 in the proposed plea agreement without seeing the reference to 5K2.0. He is just choosing to pretend he didn't for purposes of this motion.

Third, that this was the only item in the proposed plea agreement that defendant discussed with his lawyers, as he asserts, defies credulity. As noted, the total offense level in the agreement, before acceptance of responsibility, was 34. There were items in the calculation that were far less obvious than the Victims Underrepresented enhancement. For example, the

10

grouping analysis is always sufficiently complex that even experienced lawyers and judges must double check the calculation against a Guidelines manual, and this case, unusually, involved a one-point enhancement for the stipulated, but unpled, conduct. Grouping led to an additional five levels. Yet, with all of those victims out there, the only calculation in which defendant was interested was which one was covered by the Victims Underrepresented enhancement, not the far more consequential grouping analysis? I don't buy it. It supports his former lawyers' affidavits that he was totally dismissive of the plea offer because he thought he could do better by haggling, not realizing that the Government generally doesn't bluff.

      Fourth, the email exchange he has submitted with Savella supports his lawyers' versions of the events, not his. It is the only written communication he has with his lawyers mentioning the Victims Underrepresented enhancement – and it is not sent until six months after he is convicted, more than nine months after the meetings at the MDC where his lawyers recommended he accept the plea agreement. Moreover, defendant's email indicates that he had at least some idea from his lawyer what the one point might be for – "*the one you told me it was for the arson…*". (Emphasis added). True, defendant's email goes on to say "find out if it was for the arson victim or not because you never told me exactly what it was for," but there is no suggestion in the email that had defendant known "exactly what it was for," he would have pled guilty. Far more convincing is Savella's response, in which he recites that he had discussed it with defendant many times ("dozens" is obviously hyperbole) – which Savella has explained in his submissions responding to this motion referred to post-conviction communications with defendant, and that he thought it could be the arson but had not asked the Government. Again, a wise move – even post-conviction, merely asking the question could itself have driven the enhancement higher.

11

Finally, it is clear once defendant's lawyers were able to obtain a plea agreement with the 108-135 months' Guidelines estimate, they believed they had obtained, or nearly obtained, the deal defendant had asked them to get. On March 28, 2018, the Government submitted a motion on consent to adjourn the suppression hearing that had been scheduled so that

> the parties could finalize a global resolution of this case. … As of tonight … we now jointly believe that this case will likely resolve short of trial. The government anticipates issuing plea offers shortly, memorializing the terms with counsel; the offers will expire on April 6, 2018. With the Court's permission, the government will contact… [the assigned Magistrate Judge] to conduct the change of plea hearings.

Thus, defendant's lawyers, as well as the Government, thought that they had obtained what defendant had asked them to obtain, which fits precisely with his former lawyers' description of the breakdown that occurred when they presented defendant with the proposed offer.

But defendant's argument is incredible on a second level. Let's assume, as he asserts, that during plea negotiations, he tried to get an answer to the meaning of the Victims Underrepresented enhancement and could not get a satisfactory answer from his former lawyers. To obtain relief on this habeas corpus motion, he would then have to show that had they provided him with such information, he would have accepted the plea. That is not plausible. Defendant does not dispute his former attorneys' statements that he was made aware that the Government had a very strong case. The difference between not knowing what the one-point enhancement was for (as defendant alleges) and the 108-135 month estimate in the plea agreement was 11-14 months. He asks me to find that he took the risk of trial with a much higher Guidelines range only to avoid an ambiguity of about one year on an advisory Guidelines range of about 9 to 10 years.

Once again, I cannot accept that. I became well acquainted with defendant during the lengthy pretrial and trial proceedings and one characteristic, as I noted at sentencing, is that his

12

intelligence should not be underestimated. My conclusion is that this Victims Underrepresented enhancement argument is a ruse that he developed in looking for a ground for habeas relief after his compassionate release motion failed. All the circumstantial evidence in the record points to that conclusion.

Defendant also requests an evidentiary hearing to resolve the factual dispute between his reply affidavit and his former attorneys' affidavits. Not every conflict in the affidavits on a § 2255 motion requires expending the resources for an evidentiary hearing. To justify a full hearing, defendant's sworn statement that he would have accepted a plea offer if the one-point enhancement had been explained to him must be accompanied by some "objective evidence." See Raysor v. United States, 647 F.3d 491, 495 (2d Cir. 2011) (citing Puglisi, 586 F.3d at 215-16). Defendant has none of that. Instead, he offers only statements that are "self-serving and improbable." See Chang v. United States, 250 F.3d 79, 86 (2d Cir. 2001). And the fact that he offered them only after reviewing his former counsels' affidavits and the Government's opposition to his motion, rather than accompanying his motion, makes his statements even less probative. Having observed him in pretrial proceedings, trial, and at sentencing, there is no need for an evidentiary hearing on this record.

## CONCLUSION

Defendant's motion for relief under 28 U.S.C. § 2255 is denied. No certificate of appealability shall issue under 28 U.S.C. § 2253(c)(1)(A), as there has been no substantial showing of the denial of a constitutional right.

**SO ORDERED.**

*Brian M. Cogan*
U.S.D.J.

Dated: Brooklyn, New York
August 13, 2024

13